**NOT FOR PUBLICATION**                                                                    **CLOSED**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Timothy Lloyd, | : |
| | : |
| Petitioner, | : **OPINION** |
| | : |
| v. | : Civ. No. 03-813(WHW) |
| | : |
| United States of America, | : |
| | : |
| Respondent. | : |
| | : |

**Walls, District Judge**

Petitioner Timothy Lloyd, petitions, pro se, to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.  The motion is denied and his petition is dismissed.

**BACKGROUND**

**A.  Procedural History**

In January 1998, a grand jury indicted Petitioner on two counts.  Count One charged Petitioner with "knowingly and willfully caus[ing] the transmission of a program, information, code, or command, and, as a result of such conduct, intentionally caus[ing] damage, without authorization, to a protected computer that was used in interstate and foreign commerce and communication, in violation of 18 U.S.C. §§ 1030(a)(5)(A) and 2."  Count Two charged Petitioner with "knowingly and willfully transporting in interstate commerce, between New Jersey and Delaware, goods and merchandise, namely computer hardware and software and software equipment from Omega Engineering, Inc., ("Omega"), having a value of approximately $50,000, knowing the same to been stolen and converted, in violation of 18 U.S.C. §§ 2314 and 2."

After 8 days of trial beginning April 19, 2000, the jury acquitted Petitioner on Count Two and convicted him on Count One.  After the jury returned its verdict, one of the jurors

1

NOT FOR PUBLICATION                                                    CLOSED

stated that during deliberation she was influenced by watching a television report that discussed a computer virus named the "Love Bug." She concluded from this report that it was possible for Petitioner to have remotely triggered the "Time Bomb," a destructive computer program that Petitioner installed onto Omega's computer system. Accordingly, she found him guilty on Count One. (App. 922.) The Court, however, concluded that the Love Bug story substantially prejudiced the Petitioner's rights, thereby implicating his Sixth Amendment right. (Id.) The Court granted a new trial, a decision which the government appealed.

On October 12, 2001, the U.S. Court of Appeals for the Third Circuit reversed the Court's decision. It reinstated Petitioner's conviction on the ground that there was no substantial likelihood of prejudice from the "love bug" story because it was unrelated to the facts of the case. United States v. Lloyd, 269 F.3d 228, 242-43 (3d Cir. 2001). On remand, the Court sentenced Petitioner to 41 months of imprisonment and fined him $2,043,394 in restitution damages.

Petitioner appealed the conviction to the Third Circuit in March 2002. The appeal was later withdrawn and the case was dismissed on August 21, 2002.

Petitioner now moves under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence on the following grounds:

(1) The damaged computer is not a "protected computer" as defined in 18 U.S.C § 1030.

(2) An *ex post facto* violation occurred because the government retrospectively applied the 1996 version of § 1030, instead of the 1994 version;

(3) The indictment was insufficient;

(4) There was prosecutorial misconduct, including:

NOT FOR PUBLICATION                                                    CLOSED

(a) misusing an expert witness;

(b) evidence tampering;

(c) presenting false testimony;

(d) misleading the Appeals Court with false statements;

(f)     engaging in character assassination;

(g) misleading the grand jury with false statements;

(5) Ineffective assistance of counsel in the following manner:

(a)  Petitioner withdrew his appeal because of his counsel's "deception" or
ineffectiveness;

(b)  Counsel failed to motion for acquittal under Rule 29 of the Federal
Rules of Criminal Procedure;

(c)  Counsel failed to brief Petitioner on the issues relating to the Court's
decision to grant the Petitioner's motion for a new trial;

(d)  Counsel prevented Petitioner from testifying at trial

(e)  Counsel did not present Petitioner's expert witness at trial; and

(6) Newly discovered evidence shows Petitioner's actual innocence.

## B. Factual Background

The evidence at trial showed that from 1985 to July 10, 1996, Petitioner worked at
Omega Engineering ("Omega"), a company that manufactures highly specialized and
sophisticated industrial measurement devices and control equipment for, among others, the
U.S. Navy, NASA and Intel.  Omega had a computer system that linked its offices in cities
such as Newport, Boston, Bridgeport, and those in Europe. (App. 21, 28, 31, 32.)  Petitioner
held different positions at Omega, including Computer Numeric Control ("CNC")
supervisor, Omega's only computer system administrator, and product engineer for new

NOT FOR PUBLICATION                                                    CLOSED

product development. (App. 37-39.)  He was also the Novell systems administrator, through

which he created levels of access to the file server for individuals in the CNC units. (App. 55,

81, 77.)

Beginning in 1994 or 1995, Petitioner had problems interacting and cooperating with

his co-workers.  Later, he was transferred from supervisor of the CNC department to a

manufacturing engineering support person.  On June 5, 1996, he secretly interviewed for a

position with W.L. Gore and Associates in Delaware.

On July 31, 1996, the file server "Pureland One" on Omega's computer system would

not initiate. (App. 101.) Tapes that contained backup copies of Omega's CNC programs were

missing, although Petitioner was responsible for maintaining and placing these tapes in a file

cabinet.  Further, none of the computers had backup copies on their hard drives. (App. 109,

172.)  The result of the incident was that the CNC programs used to manufacturer Omega's

specialized products were lost. (App. 104, 170.)

Omega later hired On Track Data International ("On Track") to discover the cause of

and a resolution to the lost data.  Greg Olson, director of worldwide data recovery services at

On Track, determined that the computer programs used to make specialized products were

irretrievably lost and that an intentional deletion and purging of information had occurred.

(App. 547.)  Olson located on the file server a string of computer commands having a

"trigger date" of July 30, 1996 and they were based on a Microsoft Windows deletion

program.  Further, he concluded that the server had been set up so that on any date after July

30, 1996, massive amounts of information would be automatically deleted from the server

whenever it was first booted up. (App. 562.)  The string of computer commands programmed

to delete information was called "Time Bomb."   Olsen discovered that slightly altered

versions of Time Bomb were run on February 21, 1996, April 21, 1996 and May 30, 1996.

(App. 569.)

NOT FOR PUBLICATION                                                        CLOSED

A time card used to track Petitioner's working hours showed that on May 30,1996, the day when one version of Time Bomb was run, he left work at 8 o'clock at night. (App. 571.) On August 23, 1996, a Secret Service agent searched Petitioner's house and recovered two of the missing backup tapes that had been reformatted, a master hard drive from the file server, and numerous other items belonging to Omega. Olson examined the hard drive and found an exact match of the string commands from Time Bomb. (App. 571.)

After massive amounts of data were deleted from the file server on July 31, 1996, Omega lost all the programs that had enabled it to tailor its products to the specific needs of its customers. Its manufacturing process was also made less efficient. (App. 448.) Omega had a nine percent decrease in its growth, equivalent to nine to ten million dollars of loss. (App. 452.)

The government charged Petitioner on the theory that he installed the "Time Bomb" before his termination of employment, and that "it" detonated after he was fired from Omega. In response, the defense argued that the government's case was premised on a series of assumptions that could not be proven. The defense argued that the massive deletion of files could have resulted from an accident or have been caused by another employee. (App. 18-20.) At trial, nine former Omega employees testified that they never had problems with Petitioner and that he always behaved professionally. A recommendation letter by one of Omega's managers showed positive and complementary evaluations regarding Petitioner's performance at work. (App. 605.) Several witnesses testified that the change in Petitioner's position from CNC supervisor to engineering support person was not a demotion. The defense argued that because the change in position did not signal the termination of Petitioner's employment, he did not have a motive to commit the charged offense. (App. 605.) Further, several witnesses testified that numerous other Omega employees had supervisory-level access to the files. (App. 423, 679.) Two former employees also testified

that they had copied files onto floppy discs and that their computers continued to operate after the server crash.  In *voir dire,* an expert for Petitioner testified that he had recovered over 7,000 Omega files using WinHex, a software program that he took off the internet. (App. 746.)  Nevertheless, the expert did not testify in front of the jury.

On the appeal, the Third Circuit found that strong, uncontradicted evidence supported the verdict.  Evidence that went unchallenged included the string of commands found on the hard drive in Petitioner's home that was identical to that used in the program that purged the Omega network of all its files; the testimony that the Time Bomb had been tested three times previously and that on each occasion Lloyd had stayed late at the office; Petitioner's willingness to accept up to $12,000 less in a job with W.L Gore than in his position at Omega; and Lloyd's comment to a W.L.Gore employee on July 31, 1996, the day Omega network crashed, that "everybody's job at Omega is in jeopardy." Lloyd, 269 F.3d 228, at 241.

## DISCUSSION

### A.  Standard of Review

"A collateral challenge may not do service for an appeal." United States v. Frady, 456 U.S. 152, 165-166 (1982).  "To obtain collateral relief, a prisoner must clear a significantly higher hurdle than would exist on direct appeal." Id.  "Habeas corpus relief is generally available only to protect against a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." United States v. Deluca, 889 F.2d 503, 506 (3d Cir. 1989) (citing Hill v. United States, 368 U.S. 424, 428 (1962)).

"A defendant procedurally defaults on any claims he may have by failing to raise objections during trial or failing to appeal." Frady, 456 U.S. 152, 167.  "To avoid this default,

NOT FOR PUBLICATION                                         CLOSED

he must demonstrate both 'cause' for not having raised the point in question on direct appeal and 'prejudice' to him as a result of this error, or his actual innocence." Id.  A successful showing of ineffective assistance of counsel may satisfy the "cause" prong of a procedural default on other claims [that a petitioner raises on a habeas corpus motion], but only if the ineffectiveness rises to the level of a constitutional deprivation under Strickland. United States v. Mannino, 212 F.3d 835, 840 (3d Cir. 2000).

"Claims of ineffective assistance of counsel, however, are properly addressed in the first instance by the district court in a § 2255 motion." United States v. Tobin, 155 F.3d 636, 643 (3d Cir. 1998). Thus, the Court may consider Petitioner's claim for ineffective assistance of counsel without Petitioner first having shown cause or prejudice.

The Sixth Amendment states that "[i]n all criminal prosecutions the accused shall enjoy the right to have assistance of counsel for his defense." U.S. Const. Amend. VI.  A defendant has a Sixth Amendment right not just to counsel but to "reasonable effective assistance of counsel." United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)).  Strickland provides a two-pronged test to determine whether there is ineffective assistance of counsel. Strickland 466 U.S. at 687. First, the defendant must demonstrate that counsel made serious errors. Id. at 688.  To prove such deficiency, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Id.  Judicial scrutiny of counsel's performance is highly deferential. Id. at 689.  Second, "[t]he defendant must show that the deficient performance prejudiced the defense. Id. at 687.  This requires showing that counsel's errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.; Rompilla v. Horn, 355 F.3d 233, 275 (3d Cir. 2004). Unless the prisoner can surmount both of these hurdles, the Court cannot grant relief. Id.

**B.  Analysis**

NOT FOR PUBLICATION                                              CLOSED

1.   Procedurally Defaulted Claims

After Petitioner withdrew his appeal, the Third Circuit dismissed his case.  "A defendant procedurally defaults on any claims he may have by failing to raise objections during trial or failing to appeal." Frady, 456 U.S. at 167.  Petitioner attempts to avoid procedurally defaulting on grounds one through four by alleging that his failure to raise them on direct appeal was the result of ineffective assistance by his counsel.  "A successful showing of ineffective assistance of counsel may satisfy the 'cause' prong of a procedural default on other claims [that a petitioner raises on a habeas corpus motion], but only if the ineffectiveness rises to the level of a constitutional deprivation under Strickland." Mannino, 212 F.3d at 840.  Accordingly, the Court applies the two prong test set forth in Strickland to Petitioner's claims of ineffective assistance in order to determine whether the "cause" prong of Frady is satisfied. See Mannino, 212 F.3d at 840.

(1) Protected Computer

The first ground Petitioner offers to support his motion is that the indictment failed to allege any fact showing that the damaged computer was a protected computer because it was used in "interstate or foreign commerce or communication". (Pet. Brief at 6.)  Petitioner argues that the computer and the manufacturing machines it programmed were located in New Jersey, and that the indictment limited the data loss to design and production programs, neither of which are forms of commerce. (Pet. Brief at 7.)  Based on these factual allegations, Petitioner concludes that the damaged computer is not a "protected computer" under 18 U.S.C. § 1030[1]. (Id.)

---

[1] 18 U.S.C § 1030 (e)(2) (B) provides that the term "protected computer" means a computer which is used in interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States. 18 U.S.C. § 1030(e)(2)(B) (1996).

**NOT FOR PUBLICATION**                                          **CLOSED**

The evidence indicates that the damaged computer server contained the design and production programs necessary for the manufacturing of products sold in interstate commerce. (App. 447.) Omega's customers, including the U.S. Navy, NASA and Intel, were located in states other than New Jersey. (App. 21.)  The manufacturing of interstate goods for these customers falls within the definition of interstate commerce under § 1030. See U.S. v. Darby, 312 U.S. 657 (1940.)  Thus, the damaged computer was a "protected computer" under § 1030.  Petitioner's attorney was not ineffective in failing to raise this issue because it was without merit.

> (2)   *Ex post facto* violation and impermissible amendment of indictment at trial.[2]

The second argument raised by Petitioner is that the application of the 1996 version of § 1030 constitutes an *ex post facto* violation.  Count one of Petitioner's indictment states that he "knowingly caused the transmission of a program, code, or command through a computer used in interstate commerce to intentionally cause damage of at least $5000 to the computer." U.S. v. Timothy Lloyd, Indictment No.: 98-61.  Petitioner committed the charged offense on July 30, 1996, when the 1994 version of 18 U.S.C. § 1030 (a)(5)(A) was in effect; however, he was charged under the 1996 version of the statute.  Petitioner claims that charging him under the 1996 version of § 1030 violates the *ex post facto* clause of the U.S. Constitution, which forbids Congress from enacting any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." Weaver v. Graham, 450 U.S. 24, 28 (1981); See U.S. Const. Art. 1, § 9 ("No ... *ex post facto* Law shall be passed.").  A criminal law violates the *ex post facto* clause if: (1) it is retrospective, applying to events before its enactment; and (2) it disadvantages the offender affected by it. See Weaver, 450 U.S. at 29.

---

[2] Petitioner's assertion that the prosecutor impermissibly amended the indictment at trial is premised on the same argument as his allegation of an ex post facto violation; thus for analytical purposes the Court addresses these two claims together.

**NOT FOR PUBLICATION**                                                    **CLOSED**

Since Petitioner was charged under the 1996 version of § 1030, which was not effective at the time of his offense on July 31, 1996,the first prong of the test is satisfied.  As to the second prong, Petitioner argues that the 1996 amendment changed the elements necessary to prove his guilt.  He claims that the 1994 version required the involved computer be the means to commit the crime, while the 1996 amendment required that the involved computer be the receiving or damaged computer.[3] (Amendment to Pet. Brief at 3.)

The 1996 version of 18 U.S.C. § 1030 (a)(5)(A) (as amended on October 11, 1996 in the Economic Espionage Act of 1996. Pub. L. 104-294, 110 Stat. 3488 (1996)) reads: "whoever … (5)(A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer…."  As discussed above, the term "protected computer," as defined in § 1030 (e)(2)(b), includes a computer "which is used in interstate or foreign commerce or communication."

The 1994 version in effect at the time of Petitioner's offense reads:

(a)    Whoever … (5)(A) through means of a computer used in interstate commerce or communications knowingly causes the transmission of a program, information, code, or command to a computer or computer system if –

(i)    the person causing the transmission intends that such transmission will-

(I)    damage, or cause damage to, a computer, computer system, network, information, data, or program; or

(II)    withhold or deny, or cause the withholding or denial, of the use of a computer, computer services, system or network, information, data or program; and

---

[3] Petitioner argues in his § 2255 motion that "it can be readily observed from the clear language of the two acts that the jurisdictional element of the offense shifted from a 'computer used in interstate commerce or communication' being the means to commit the unlawful acts in the 1994 version to the 'computer used in interstate commerce or communication' being the receiving computer or the computer upon which the unlawful act created the damage in the 1996 version." (Amendment to Pet. Brief at 3.)

**NOT FOR PUBLICATION**                                                    **CLOSED**

> (ii)     the transmission of the harmful component of the program, information, code or command-
>
> > (I)     occurred without the authorization of the persons or entitles who own or are responsible for the computer system receiving the program, information, code or command; and
> >
> > (II)    (aa) causes loss or damage to one or more persons of value aggregating $1,000 or more during any 1-year period…"

It follows that both the 1994 and 1996 versions of the statute require the same elements to substantiate a finding of guilt: unauthorized access, the involvement of a computer used in interstate commerce, and the transmission of a disabling code, program, information, or command.[4]   Likewise, the punishment under § 1030 remains unchanged between the two versions.[5]

A close analysis of both versions reveals the following differences.  First, the 1996 version broadened the definition of "protected computers" to cover computers used in

---

[4] That the elements necessary to prove guilt under 18 U.S.C. § 1030 (a)(5)(A) did not change with the 1996 amendment to the statute is supported by the legislative history. See 142 Cong. Rec. S.10886-01, S.10889-S.10890 (daily ed. Sept. 18, 1996) (statement of Sen. Leahy); S. Rep. No. 104-357, at 9-12 (1996).

[5] The 1996 version of the statute provides the following punishment:
    (3) (A) a fine under this title or imprisonment for not more than five years, or both, in the case of an offense under subsection (a)(4), (a)(5)(A), (a)(5)(B), or (a)(7) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph; and
    (B) a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(4), (a)(5)(A), (a)(5)(B), (a)(5)(C), or (a)(7) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this section;
18. U.S.C. §1030 (c) (1996) (amended 2001) .  The 1994 version of the statute provides the following punishment:
    (3) (A) a fine under this title or imprisonment for not more than five years, or both, in the case of an offense under subsection (a)(4) or (a)(5)(A) of this section which does not occur after a conviction for another offense under such subsection, or an attempt to commit an offense punishable under this subparagraph; and
    (B) a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(4) or (a)(5) of this section which occurs after a conviction for another offense under such subsection, or an attempt to commit an offense punishable under this subparagraph;
18 U.S.C. § 1030 (c) (1994) (amended 1996).

**NOT FOR PUBLICATION**                                                    **CLOSED**

foreign commerce or communication. <u>See</u> 18 U.S.C. § 1030 (e)(2)(B).  Second, the 1996 version no longer includes the detailed description of criminalized activities that were found under subsection (a)(5)(A)(i) – (ii) of the 1994 version.  Third, the 1996 version increased the requisite minimum damage from $ 1,000 to $ 5,000. [6]

None of these differences disadvantaged Petitioner because they did not affect the outcome of his conviction.  First, the damaged computer was protected under the 1994 version because the computer was used in interstate commerce.  Second, through Petitioner's conduct of installing "Time Bomb" onto the computer system with the intent to cause massive deletion of data, he has violated the 1994 version.  Finally, the damage caused in the current case was nine to ten million dollars, which far exceeds the minimum amount of damages actionable under the 1994 version.  Absent any disadvantage to Petitioner from the application of the 1996 version of the statute, no *ex post facto* violation exists and Petitioner's attorney was not ineffective in failing to raise this claim.

(3)   Insufficient indictment

Petitioner's third argument is that the legislature intended the term "transmission" as used in 18 U.S.C. § 1030 (a)(5)(A) to mean transmission through "remote access" only.[7] (Pet. Brief at 7.) Petitioner claims that his indictment was insufficient because the

---

[6] The 1996 version of the statute reads:
   (8) the term "damage" means any impairment to the integrity or availability of data, a program, a system, or information, that – (A) causes loss aggregating at least $ 5,000 in value during any 1-year period to one or more individuals;
18 U.S.C. § 1030 (e)(8)(A) (1996) (amended 2001). The 1994 version of the statute reads:
   (II)        (aa) causes loss or damage to one or more persons of value aggregating $1,000 or more during any 1-year period…"

18 U.S.C § 1030 (a)(5)(A)(ii)(II)(aa) (amended 1996).

[7] Petitioner claims that the "legislative intent for the term transmission as used in 18 U.S.C. § 1030 (a)(5)(A) is to mean transmission via some telecommunication device between 2 or more computer[s] (means) each under the control of some specific computer program expressly designed to support such intercomputer communication (method) commonly referred to as 'remote access' " (Pet. Brief at 7.)

**NOT FOR PUBLICATION**                                          **CLOSED**

government proved only direct access at trial, thereby failing prove the element of transmission under § 1030.

"Generally, when determining the meaning of a statute, a court should apply textualism and begin with the statutory language." Holder v. Hall, 512 U.S. 874, 914 (1994). However, "when the statutory language is indecipherable, as in the case of textual ambiguity, the court should turn 'to the legislative purpose as revealed by the history of the statute, for such light as it may shed.'" Concrete Pipe and Prods. of California, Inc. v. Construction Laborers Pension Trust for Southern California, 508 U.S. 602, 627 (1993).

According to the dictionary, "transmission" is generally defined as an act, process, or instance "to cause to go or be conveyed to another person of place." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 2429 (Merriam-Webster Inc. 1993) (1961). This definition does not distinguish between remote and direct access. Rather, it unambiguously appears to cover both types of access. That "transmission" is defined more broadly than Petitioner argues is supported by the legislative intent and case law. In North Texas Preventative Imaging v. Eisenberg, 1996 WL 1359212 (C.D. Cal August 19, 1996), the court concluded that the 1994 version of § 1030 focused on harmful intent and resultant harm, rather than on the technical concept of computer access. The 1994 legislative intent enforced the court's determination: "Senator Leary stated that 'the new subsection of the CFAA created by this bill places the focus on harmful intent and resultant harm, rather than on the technical concept of computer access…. The computer abuse amendments make it a felony intentionally to cause harm to a computer or the information stored in it by transmitting a computer program or code-including destructive computer viruses-without the knowledge and authorization of the person responsible for the computer attacked. This is broader than existing law, which prohibits intentionally accessing a federal interest computer without authorization, if that causes damage.' 139 Cong. Rec. S16421-03, Nov. 19, 1993 (stmt. of

NOT FOR PUBLICATION                                                                  CLOSED

Sen. Leahy) (reprinted at 1993 WL 490040)." North Texas Preventative Imaging v.
Eisenberg, 1996 WL 1359212 (C.D. Cal August 19, 1996). Obviously, Petitioner's
interpretation of the term transmission is incorrect and the indictment is not insufficient.

      Petitioner also argues that because he was authorized as an employee to access the
computer, the government did not prove that the transmission was "without authorization,"
as required under § 1030. (Pet. Brief at 9.)   Contrary to Petitioner's contention, the term
"without authorization" modifies the element of intentionally causing damage to a computer.
To read the statute as Petitioner does requires twisting the statutory language and violates
common sense.   Thus, by proving that Petitioner was without authority to damage the
computer the government has satisfied this requirement under § 1030 and Petitioner's
attorney was not ineffective in failing to raise this claim.

      (4)   Prosecutorial misconduct

      Petitioner advances the claim of ineffective assistance of counsel to satisfy the
"cause" prong under Frady in order to preserve the claims of prosecutorial misconduct.
Petitioner alleges that the government engaged in seven types of prosecutorial misconduct:
(1) misusing an expert witness; (2) evidence tampering; (3) presenting false testimony; (4)
misleading the Court with false statements; (5) misleading the Court of Appeals with false
statements; (6) engaging in character assassination; and (7) misleading the grand jury with
false statements.

      a.   Misusing an expert witness

      Petitioner claims that Olson was not an expert qualified to testify about data recovery
because the "primary objective of [Olson's] analysis is to recreate the scenario by which
Omega's Pureland One file server was damaged." (Pet. Brief at 11.)   The government
conclusively established, however, that Olson was a leading expert on data recovery when he
testified that his employment focused primarily on data recovery. (App. 534.)   Olson was

**NOT FOR PUBLICATION**                                                 **CLOSED**

responsible for the global data recovery operation at On Track and has performed over 1,000,000 data recoveries. (App. 535.)  Moreover, he created software that instructs general users on the recovery of computer data. (App. 537.) Thus, even though the Petitioner's attorney did not object to Olson's qualifications, his performance did not "f[a]ll below an objective standard of reasonableness and there was no ineffective assistance of counsel." Strickland, at 688.

> b.  Evidence tampering

After the file server crashed at Omega, the Secret Service obtained from Omega the damaged hard drives, which were later given to On Track, the government's expert witness, for data recovery.  Petitioner received copies of the damaged hard drives, both from the Secret Service and On Track.  He argues that the government has tampered with the copies of the hard drives from On Track because these drives were not the same as those provided by Secret Service.  He contends that different amounts of "zeroes" were inserted onto the drives from Secret Service and from On Track—over 1.5 megabytes of zeros were inserted onto the former and over 3.5 megabytes of zeros onto the latter. (Pet. Brief at 12.)  He also asserts that his expert was able to fully recover all the loss data once these offending zeroes were removed. (Pet. Brief at 11-13.)  Furthermore, Petitioner claims that on Sep. 3, 1996, four files were added onto copies of the drives from On Track.  Among these files, one was deleted and no longer contains data, and the other three were word processing documents consisting of resumes and correspondence documents. (Exhibit D11- 13; Motion 11-14; App.731.)

Other than the discrepancy among the copied drives, Petitioner did not provide any evidence to demonstrate how the alleged tampering of evidence occurred.  Considering that the sufficiency of evidence to prove Petitioner's guilt was first decided by the trial court, and later affirmed by the Third Circuit, Petitioner has failed to provide sufficient evidence to overcome the strong presumption of the validity of the trial court's judgment.

**NOT FOR PUBLICATION**                                                    **CLOSED**

In addition, Petitioner has failed to satisfy the "prejudice" test under <u>Strickland</u>. The Third Circuit found "strong, uncontradicted evidence to support the verdict." <u>U.S. v. Lloyd</u>, 269 F.3d at 242. As example, "the string of commands [from Time Bomb] found on the hard drive in Petitioner's home was identical to that used in the program that purged the Omega network of all its files." <u>Lloyd</u>, at 242. Thus, such discrepancy among the copied drives will not prejudice the sufficiency of the proof and Petitioner's attorney was not ineffective on this issue.

Even if the Petitioner's expert could recover all the loss data by removing the inserted zeroes, it would only reduce the amount of damage. The requisite $5,000 of damage under the 1996 version of § 1030 can clearly be satisfied considering the economic loss incurred on the day Time Bomb detonated. Thus, the defense attorney's failure to claim tampering of evidence did not prejudice Petitioner to the extent as to "deprive him of a fair trial". <u>See</u> <u>Strickland</u>, at 689. The defense attorney was not ineffective on this issue.

Petitioner also claims that his attorney would not call the prosecutor a "liar". Petitioner contends that this enabled the government to modify a list of certified inventory of items taken from his home to include a hard drive (S/N K20SR7K5), which he claims was never seized from his home and was falsely introduced into evidence. (Pet. Brief at 14.) Other than his self-serving statements, Petitioner offers no evidence to support this claim. <u>See</u> <u>Sayre v. Anderson</u>, 238 F.3d 631,636 (5th Cir. 2001) (conclusory allegations are not sufficient evidence to establish that counsel performed deficiently). In addition, he claims that certain evidence was not signed[8], but failed to show how the unsigned evidence prejudiced his case. Thus, Petitioner's claims fail the "prejudice" test under <u>Strickland</u>.

     c.   False and misleading testimony.

---

[8] Petitioner claims that APX <u>M</u>, a copy of the handwritten Seized Property Inventory List made after the search of Petitioner's home, was not signed; APX <u>H</u> was also not signed. (Pet. Brief at 14.)

16

NOT FOR PUBLICATION                                             CLOSED

Petitioner claims that the prosecutor presented the following false and misleading testimony:

(a)    Petitioner claims that the government's theory about how "Time Bomb" deleted files from the computer system is both untrue and inconsistent with the theories of computer science. (Pet. Brief at 15.)    At trial, Petitioner's attorney argued to the jury that the government's case was based on a series of assumptions that could not be proven.  The defense argued that the massive deletion of files could have resulted from an accident or been caused by another employee. (App. 18-20.)  At trial, nine former Omega employees testified that they never had problems with Petitioner and that he always behaved professionally.  A recommendation letter by one of Omega's managers showed positive and complementary evaluations regarding Petitioner's performance at work. (App. 605.)  Several witnesses testified that the change in Petitioner's position from CNC supervisor to an engineering support person was not a demotion.  Thus, the theory goes that because the change in position did not signal the termination of Petitioner's employment, he never had a motive to commit the charged offense. (App. 605.)  Several witnesses also testified that numerous other Omega employees had supervisory-level access to the files. (App. 423, 679.)  Two former employees also testified that they had copied files onto floppy discs and their computers continued to operate after the server crash.

As the Third Circuit observed, it is up to the jury to assess the credibility of witnesses and choose between the government's and the defendant's view of evidence. Lloyd, 269 F.3d 228 at 235.  Petitioner's attorney's representation did not "fall below an objective standard of reasonableness" through their failure to overcome the government's theory about the Time Bomb.  Petitioner's argument fails the first prong of the Strickland test.

(b)    Petitioner claims that the government provided false testimony when they asked the expert witness, Olson, to testify about how operating systems store data on hard drives.

NOT FOR PUBLICATION                                          CLOSED

He claims that Olson provided only examples of MSDOS operating systems, instead of Novell, the type of operating system on the damaged computer.  He also argues that Olson's testimony about storage algorithm was theoretically unsound and inconsistent with the workings of any PC operating system. (Pet. Brief at 16; App. 541.) However, Olson's one page of testimony on this issue served only as background information on the computer system and was unrelated to any essential element of the government's theory.   Even assuming *arguendo* that the testimony was false, Petitioner's case would not have been substantially prejudiced.   Therefore, the alleged mistake does not satisfy the test for "prejudice" under Strickland.

        Petitioner also claims that the prosecutor made a malicious comment to discredit Petitioner's expert witness by saying that "[the witness was] also aware that [WinHex] has no applicability in Novell.  It's a Windows based software." (Pet. Brief at 17.)  Here too, Petitioner has failed to show how this testimony has prejudiced his case.

        (c)     Petitioner also argues that the government witnesses provided "false, incomplete and /or misleading testimony." (Pet. Brief at 15, 17.)  Specifically, Petitioner claims that the government's expert witness, Olson, falsely testified to "hav[ing] personally recovered 1,000,000 storage devices."  Petitioner believes such a recovery would have taken about 500 years. (Id.)  As discussed earlier, evidence at trial conclusively establishes Olson's expertise in data discovery.  Moreover, Petitioner fails to show how any possible false testimony on this issue would have prejudiced his case.  Absent such a showing, Petitioner has failed to satisfy the requirement of prejudice under Strickland.

                d.   Character assassination

        Petitioner also argues that the prosecutor attempted to assassinate his character in front of the jury by commenting about his character and behavior. (Pet. Brief at 17.)  The comments are as follows: "Tim Lloyd… was an employee in a very important position and

NOT FOR PUBLICATION                                        CLOSED

yet this was his parting shot to a company he was leaving in July of 1996. But he was going

to go out on his own terms." (App. 4.); "This was not an accident,… this was an act of

revenge." (App. 6.); "It was a well-conceived devious plan almost a perfect crime,…"(App.

5.); "All because of an egotistical employee who refused to be a team player." (App. 6.);

"His unwillingness to be a team player," (App. 8.); "He undermined his colleagues when he

saw fit. Oftentimes it's a rather childish characterization, I suppose, but he refused to play

well with others. But, it's apt because oftentimes some of the things Tim Lloyd did were

childish…" (Id.); "He became an obstructionist at times in little things." (Id.); and "Tim

Lloyd begins to lose face, doesn't want to take responsibility for the flaws that occurred

based on a lack of quality. His attitude towards his colleagues doesn't get any better, it get

worse. And in early 1996 he became more belligerent to certain colleagues, even to the point

of physically intimidating certain people. A walk down the hallway, he will throw an elbow

into the shoulder of a young woman or to one of the other supervisors." (App. 10.)

     The prosecutor made these statements in his opening statement.  A conviction is set

aside if the prosecutor's remarks, taken in the context of the trial as a whole, where

sufficiently prejudicial to have deprived the defendant of his right to a fair trial. United States

v. Retos, 25 F.3d 1220, 1224 (3d Cir. 1994.)  However, in Lawrie v. Snyder, 9 F. Supp. 2d

428, 440 (1998), the prosecutor's opening statement which included the phrases "living

nightmare," "lifeless bodies…", "stacked like rag dolls," and "living hell" was found

permissible. Id.  In the current case, the prosecutor's comments were based on the testimony

of the witnesses and were less harsh than the Lawrie statement.  Further, the defense lawyer's

opening statement rehabilitated Petitioner's impaired image by noting the following: "Mr.

Lloyd who the ten year, almost eleven year employer of Omega, good citizen, the good

soldier… He was a good employee.  He was an excellent employee." (App. 21.); and "…you

are going to hear from the government's witness that in March of 1996, …he gets a raise.  In

NOT FOR PUBLICATION                                          CLOSED

January of 96 they give him a nice year end bonus.  If this guy's such a problem, why did he get bonuses and year end raises?" (App. 23.) The defense also brought in several Omega employees to testify that Petitioner never had problems working with them and that he was always professional.  Therefore, the defense attorney's representation satisfies the objective standard of reasonableness and Petitioner's argument fails the first prong of the <u>Strickland</u> test.

   e. Misleading the grand jury

  Petitioner claims that the prosecutor misled the grand jury in his questioning of Omega plant manager Jim Ferguson. The prosecutor asked, "[s]o, in other words, the computer that is in the Bridgeport facility is connected interstate with your U.S. cities as well as can be connected to your states outside the United States?"  Ferguson then answered, "[y]es, that's correct." (Pet. Brief at 18.) Petitioner claimed that this line of questioning was misleading because it insinuates that the Novell server was connected interstate, while the only computer at Omega that connected with outside sites was a VAX computer unrelated to the damaged Novell file server. (<u>Id</u>.)

  Again, Petitioner's argument fails the "prejudice" test of <u>Strickland</u>, because whether the damaged Novell file server is connected to other computers in the system is not material to any element of the government's case.  Rather, the damaged computer need only be one that is used in interstate commerce.  For this reason, this argument is unpersuasive.

   f. Misleading the appellate court

  Petitioner's final claim of prosecutorial misconduct is that during the oral arguments before the Court of Appeals, the government falsely stated that "…Lloyd … was the only person that had access to the computer." (Pet. Brief at 19.)  Petitioner notes that the government's own witness testified that petitioner was not the only person who had

**NOT FOR PUBLICATION**                                                          **CLOSED**

supervisory access to the computer. (<u>Id</u>.)  Also, Petitioner's attorney provided testimony that other employees also had supervisory access to the computer. (App. 679.)  To the extent that the government may have made a misstatement, this misstatement would not have prejudiced Petitioner's case to the extent as to deprive him of a fair trial, as the Court of Appeals had the full record before it with testimony to the contrary.  Moreover, the record does not show that whether Petitioner had sole access to the computer as being a crucial element to proving his guilt.  Accordingly, this argument is also without merit.

Petitioner also claims that the government failed to satisfy the "without authorization" element when they stated that the offense was committed when Petitioner was authorized to access the computer as an administrator. (<u>Id</u>.) As discussed earlier, this argument fails because Petitioner misinterprets the statute. In sum, Petitioner's claims of prosecutorial misconduct are without merit as Petitioner has failed to satisfy the cause and prejudice prongs of <u>Strickland</u>.

## 2.   Separate Claim on Ineffective Assistance of Counsel

The fifth ground raised by Petitioner in support of his motion is an ineffective assistance of counsel claim. Petitioner argues that his counsel was ineffective in five ways. Each of these allegations is addressed in turn.

(1)   Withdrawal of Petitioner's appeal

Petitioner claims that his counsel was deceitful in telling him that he had no appealable issues. (Pet. Brief at 4.)  However, Petitioner presents no facts supporting this contention.  He states that "[counsel] pacified (deceived) this Petitioner that they would handle critical matters when in fact they did not." (<u>Id</u>.)

The petitioner must set forth facts to support his contentions. <u>Zettlemoyer v. Fulcomer</u>, 923 F.2d 284, 298 (3d Cir. 1987).  There is no evidence indicating that Petitioner

**NOT FOR PUBLICATION**                                        **CLOSED**

withdrew the appeal involuntarily, nor is there any evidence of deception or coercion on the part of defense counsel.  Merely claiming that he was deceived into withdrawing his appeal without any evidence to support the allegation renders this argument meritless.  Moreover, even if Petitioner did have evidence of counsel's deficiency, there is no indication that Petitioner was prejudiced by withdrawing the appeal in light of the Court of Appeals earlier statement that there was "strong uncontradicted evidence to support the verdict." Lloyd, 269 F.3d at 242.

> (2)   Failure to raise a Rule 29 motion for acquittal

Rule 29 of the Rules of Criminal Procedure states that a judgment of acquittal may be made for any offense "for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. Considering that the sufficiency of evidence to prove Petitioner's guilt was first decided by the trial court, and later affirmed by the Third Circuit, Petitioner has failed to provide sufficient evidence to overcome the strong presumption of the validity of the trial court's judgment.  After reviewing the evidence in this case, the Third Circuit found that there was "strong uncontradicted evidence to support the verdict" and overturned the district court's granting of a mistrial based on a juror being influenced by extraneous information about Love Bug. Lloyd, 269 F.3d at 242.  Even assuming *arguendo* that the defense counsel erred in failing to raise the Rule 29 motion, the result of the case would remain unchanged. Therefore, the alleged failure did not satisfy the "prejudice" test of Strickland.

> (3)   Failure to brief the issues on appeal regarding the motion for new trial

Petitioner claims that defense counsel failed to brief him on the issues relating to the government's appeal of this Court's decision to grant a new trial.  Petitioner quotes the Third Circuit's opinion in this matter: "the government contends on appeal that the District Court abused its discretion in granting the defendant's motion for a new trial based on Simpson's testimony about her subjective reaction to extraneous information and that the court's inquiry

into her subjective reaction violates Rule 606(b) of the Federal Rules of Evidence." Lloyd, 269 F.3d at 237.  The Third Circuit "note[d] that Lloyd's brief on appeal fails to address these issues, and instead concentrates on the Six Amendment's protection of the right of confrontation and cross-examination, issues we believe are not raised by the circumstances here." Id.  He argues that but for the defense counsel's failure to properly address the issues, the Court's decision granting a new trial would have been upheld and his conviction would have been overturned.

Even if defense counsel was deficient on this point, the deficiency does not rise to the level of prejudice demanded by Strickland. See Strickland, at 688.  "[A] court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the error." Strickland, at 694. The sufficiency of the evidence to prove Petitioner's guilt was first decided by the trial court, and later affirmed by the Third Circuit. Petitioner has failed to show that had his attorney addressed the issues as the Third Circuit saw them, this Court's ruling would have been upheld and a new trial would have produced a not guilty verdict.  Even if defense counsel was deficient in failing to address the appropriate issues on the appeal, it is reasonably likely that the result of the case would remain unchanged.  As said before, the Court of Appeals found that there was "strong uncontradicted evidence to support the verdict." Lloyd, 269 F.3d at 242.  Because Petitioner cannot satisfy the "prejudice" prong of the Strickland test, this claim lacks merit.

    (4)   Petitioner's waiver of his right to testify

Petitioner claims that his attorney prevented him from testifying at trial.  He claimed that after vehement objections from him and his family, defense counsel still failed to put him on the stand. (Pet. Brief at 25.)  Petitioner provided an affidavit from his sister stating that she overheard a conversation between Petitioner and his attorney on May 2, 2002, when

NOT FOR PUBLICATION                                                           CLOSED

Petitioner said he wanted his expert witness to take the stand and that if the expert did not, then Petitioner would do so himself. (Table of exhibits S-1).

A "barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him…. Some greater particularity is necessary,… such as an affidavit from the lawyer who allegedly forbade his client to testify…." Underwood v. Clark, 939 F.2d 473, 476 (7th Cir. 1991). "Some courts go further and insist in effect that the defendant have protested his lawyer's action to the judge during the trial." Id. at 476 (citing United States v. Martinez, 883 F.2d 760-61 (9th Cir. 1989); United States v. McMeans, 927 F.2d 162, 163 (4th Cir. 1991.)) "A court is not required to determine a defendant's waiver with absolutely certainty. If the defendant wishes to testify, it is his burden to make it clear to the court." Brooks v. Zimmerman, 712 F. Supp. 496, 503 (W.D. Pa. 1989).

During trial, this Court questioned Petitioner about his not testifying:

J. Walls: Mr. Lloyd, I have been told by your attorney that you…wish me to charge the jury of your right to remain silent...Do you wish me to so advise the jury?
Lloyd: Yes, sir. Thank you very much. (App. 792-93.)

The trial court records do not indicate that Petitioner wanted to testify and Petitioner explicitly told the court that he waived his right to testify during the trial.  The only evidence provided by Petitioner on this issue is the affidavit from his sister, which is also self serving. The affidavit does not have the particularity required by Underwood, where the court required an affidavit evincing a higher level of particularity than what Petitioner provides. Underwood, 939 F.2d at 476.  Even if this Court holds Petitioner to a lower standard than required by the Martinez and McMeans courts, the Court is not persuaded by Petitioner's argument.

(5)   Failure to present Petitioner's expert witness for testimony

NOT FOR PUBLICATION                                               CLOSED

Petitioner argues that his expert witness, Peter Constantine, was prevented from testifying that Constantine had recovered over 7,000 Omega files two days before the trial. (Pet. Brief at 24.)

"Decisions on which witnesses to call to testify are normally strategic decisions left to counsel." United States v. Griffin, 1993 WL 34927 at *5. (E.D. Pa. 1993) (citing Diggs v. Owens, 833 F.2d 439 (3rd Cir. 1987.))   Attorneys are not required to call every witness suggested to them; their expertise leads them to choose only the witnesses likely to assist the case. United States v. Balzano, 916 F.2d 1273, 1294 (7th Cir.1990).  "[T]he tactical decision of whether to call specific witnesses--even ones that might offer exculpatory evidence--is ordinarily not viewed as a lapse of professional representation." United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1996), cert. denied, 522 U.S. 846, 118 S.Ct. 130, 139 L.Ed.2d 80 (1997); see also United States v. Romero, 54 F.3d 56, 60 (2d Cir.1995).

In voir dire, Constantine testified that he never received training from Novell. (App. 740.)  He said that he had recovered data from a Novell operating system three other times from 1996 to 2001. (App. 741.)   He also claimed that he had analyzed "around 50" computers or drivers during his career, only one of which involved a purge on a Novell system. (App. 715, 741.) He also claimed that he had recovered over 7,000 Omega files using WinHex, a software program that he found on the internet. (App. 746.)

On the other hand, the prosecution's main expert witness, Olson, was proficient in Novell. (App. 534, 535.)   He had personally performed over one million Novell data recovery operations.  He had also designed two certified commercially successful Novell products. (App. 535, 537.)

Moreover, in a letter from Petitioner's trial court attorney, the attorney wrote "On Track… is the leading data recovery and analysis firm in the country.  They were the expert

**NOT FOR PUBLICATION**                                                     **CLOSED**

for the government prosecutors, and it was next to impossible to find a qualified expert [for the defense].   I personally contacted approximately 30 experts, and I believe Mr. Lloyd contacted at least 10-20 experts…. [T]he experts that we did retain for trial corrupted the evidence… or ultimately proved not helpful. " (Table of Exhibit Q-5.)

Considering the significant discrepancy in experience between the two experts, it is likely that Constantine's credibility would have been seriously challenged on cross-examination.  Also, the strength of the evidence available from those experts would differ significantly, as the defense attorney observed.   In light of these circumstances, it was reasonable for the defense attorney to choose not to put Constantine on the stand. See Hess v. Mazurkiewicz, 135 F.3d 905, 908- 909, 911. (3d Cir. 1998.) (finding an attorney's decision not to present a witness reasonable trial strategy because though possibly helpful, it might have had prejudicial effects).  Accordingly, Petitioner's argument fails the deficiency prong of Strickland.

3.   Newly discovered evidence to prove actual innocence

Ground Six contends that newly discovered evidence proves Petitioner's innocence. Petitioner restates the evidence he introduced during trial, namely that the government's theory was unsound and that the lost Omega data was recoverable by his expert. He presents affidavits regarding his character ("Table of Exhibits" at D-10) and an affidavit that it was Al Difrancesco and others who may have caused the deletion of files. ("Table of Exihibits" at K-1.)

Newly discovered evidence warrants a new trial under § 2255 if the following five requirements are satisfied:

(1) The evidence must be in fact newly discovered, i.e., discovered since trial;
(2) facts must be alleged from which the court may infer diligence from on the part of the movant;
(3) the evidence relied on must not be merely cumulative or impeaching;

**NOT FOR PUBLICATION**                                         **CLOSED**

(4) it must be material to the issues involved; and

(5) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

Government of Virgin Island v. Lima, 774 F.2d 1245, 1250 (3rd Cir. 1985) (citing United

States v. Ianelli, 528 F.2d 1290 (3rd Cir. 1976.)).  Petitioner's argument immediately fails the

first test because evidence about the data recovery is not newly discovered.  During his *voir*

*dire*, Constantine claimed that he had recovered over 7,000 Omega data files. (App. 746.)

Petitioner failed to provide any evidence which was discovered after the trial. Because this

element is not satisfied, Petitioner's request for a new trial must be denied.

In Petitioner's opposition to the government's recent motion to revoke his bail

pending disposition of his § 2255 motion, Petitioner in essence attempts to amend his

petition by introducing a new expert report to support his innocence.  Petitioner maintains

that this new expert report satisfies the five-part test for obtaining a new trial based on newly

discovered evidence.  Petitioner argues that this expert report satisfies the first two prongs of

the test because the evidence was not discovered until after trial when proper testing could

take place.  The government responds that this evidence is not newly discovered as it is

merely a repackaging of Petitioner's theory being presented by a different expert than the one

defense counsel attempted to use at trial.

As to whether the evidence is newly discovered, while the evidence would be

introduced by a new expert, the expert's conclusions appear to be the same as to what

Petitioner or his original expert, Constantine, would have testified to had they testified at

trial.  Both Constantine and the new expert would have testified that had the program been

run as the government said it was, then certain files that were on the hard drive after the Time

Bomb program had been run should have been deleted.  The Court agrees with the

government that this evidence is not really newly discovered but rather corroborative of what

Petitioner had already known but not presented at trial.   Moreover, while Petitioner claims

NOT FOR PUBLICATION                                          CLOSED

that technology has improved since the time of trial, Petitioner fails to offer any concrete evidence that the expert's findings are based on new technology that did not exist at the time of trial.

Petitioner also argues that the facts show he has been diligent in trying to obtain this new evidence.  In Petitioner's reply brief dated December 15, 2003, he states that government did not deliver the last of the hard drives to him until twenty-one days before trial was set to begin. (Reply at 10.)  Petitioner argues that because the drives were corrupted by the government when he received them, it was impossible for proper testing on the drives to be completed in that time frame.  While the Court is not challenging Petitioner's assertion that work had to be completed on the drives before testing could begin, Petitioner does not allege that he or his counsel sought an adjournment of the trial date so that proper testing could be completed.  That neither he nor his counsel asked the Court for an extension in light of the government's last minute production of the drives and their alleged corrupted nature cuts against his claim that he was working diligently to discover this evidence.  Petitioner is also hurt by his own statements in his original petition where he states that Constantine was prepared to testify about how the DELTREE program could not have been run according to the prosecution's theory because his testing showed that certain files were deleted in testing but were on the hard drives after the program had supposedly been executed by Petitioner at Omega.  If Petitioner is to be believed, this shows that Petitioner and/or Constantine had performed at least some testing on the drives before and/or during the trial.

Petitioner has failed to sufficiently demonstrate that the first two prongs of the test for a new trial are satisfied.  For these reasons, Petitioner's motion to vacate, set aside, or correct his sentence is denied.

**C.    Certificate of Appealability**

**NOT FOR PUBLICATION**                                                                 **CLOSED**

Under 28 U.S.C. § 2253, a certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473 (U.S. 2000); United States v. Cepero, 224 F.3d 256, 262-64 (3d Cir. 2000) (en banc).  This requires "a demonstration that . . . includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack, 529 U.S. at 483, (quoting Barefoot v. Estelle, 463 U.S. 880, 894 (U.S. 1983)) (internal quotation marks and citation omitted).

For the reasons stated in this opinion, Petitioner has not made a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253.  Accordingly, a certificate of appealability shall not be issued.

## CONCLUSION

For the preceding reasons, Petitioner's request for relief pursuant to 28 U.S.C. § 2255 is denied.

**/s/William H. Walls**
United States District Judge